# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cr-297-SDJ-KPJ-1 |
| | § | |
| MARCO PEDRO ALONSO (1), | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Marco Pedro Alonso's ("Defendant") Motion to Suppress Evidence (the "Motion") (Dkt. 21), wherein Defendant seeks to suppress evidence that was seized during a search of two vehicles on January 9, 2022. The Government filed a response (Dkt. 29), and Defendant filed a reply (Dkt. 30). On July 26, 2023, the parties appeared for a hearing (the "Hearing") on the Motion (Dkt. 21), during which Deputies Caleb Kilhefner ("Deputy Kilhefner") and Curtis Johnston ("Deputy Johnston" and together with Deputy Kilhefner, the "Officers"), both of whom were employed by the Collin County Sheriff's Office at the time of the events relevant to the Motion (Dkt. 21),[1] testified as Government witnesses. *See* Dkt. 35. Pursuant to 28 U.S.C. § 636(b) and E.D. TEX. CRIM. R. 59(d), the Motion (Dkt. 21) was referred to the undersigned for a Report and Recommendation. *See* Dkt. 24. For the reasons that follow, the Court recommends the Motion (Dkt. 21) be **DENIED**.

---

[1] At the Hearing, Deputy Kilhefner testified that he is currently employed by the McKinney Police Department. Deputy Johnston testified that he is still employed by the Collin County Sheriff's Office.

I.  BACKGROUND

On the morning of January 10, 2022, a resident ("P.R.") of the home located at 2741 County Road 722, McKinney, Collin County, Texas (the "Property") observed an unfamiliar Chevrolet pickup truck (the "Truck") parked on the Property; P.R. did not own the Truck, nor did she know to whom the Truck belonged. *See* Dkt. 21 at 2. P.R. contacted the police, and at approximately 10:07 a.m., Deputy Kilhefner was dispatched to the Property. *See id.* The Truck was not visible from the roadway, as the Truck was obscured by cars parked in the driveway and the Property itself. *See* H'rg at 10:25. Upon entering P.R.'s backyard, Deputy Kilhefner saw the Truck and observed that the Truck was damaged and the Truck's windshield appeared fogged from the interior. *See id.* at 10:26. Deputy Kilhefner further observed that the Truck's windows were tinted. *See id.* Deputy Kilhefner testified that based on his experience, the damage to the Truck was consistent with the Truck hitting something while in motion. *See id.* at 10:27–28. He further testified that based on his experience, the damage to the Truck's front left tire "rendered [the Truck] undrivable." *Id.* The following are three pictures of the Truck, taken the morning of January 10, 2022, which were offered and admitted as Government's Exhibit 1:



**Picture 1: Damage to Truck's Front-End**



**Picture 2: Damage to Truck's Front Left Tire**



**Picture 3: Damage to Truck's Rear-End**

Deputy Kilhefner testified that the apparent fogging from the interior of the Truck's windshield led him to believe that someone may be in the Truck. *See* H'rg at 10:31–32. Deputy Kilhefner ran a registration check of the license number on the Truck's back license plate, which returned that the Truck was registered to Laura Esparanza ("Ms. Esparanza"). *See id.* at 10:34. Deputy Kilhefner called for backup, and once Deputy Johnston arrived at the Property, the Officers approached the Truck, knocked on it, and attempted to open it. *See id.* at 10:35. Upon realizing the Truck was locked, the Officers "quickly peered" through the windows to see if there were any

3

"major obstructions," such as a person. *Id.* The Officers ascertained that there were no such obstructions, so they "peered further" into the Truck. *Id.* Deputy Kilhefner testified that upon peering further into the Truck, he observed open Modelo beer cans on the floorboard of the Truck, Swisher Sweets cigar packets, and "in plain view was a green leafy substance that [he] believed to be marijuana." *Id.* at 10:35–36. Deputy Kilhefner testified that based on his experience, cigars such as Swisher Sweets are commonly modified to contain marijuana instead of tobacco, and, given the apparent marijuana he had seen in the Truck, he believed the Swisher Sweets in the Truck contained marijuana. *See id.* at 10:36. Deputy Kilhefner further testified that there was marijuana in plain view in the Truck. *See id.* at 11:24.

Thereafter, Deputy Johnston left the Property to drive to Ms. Esparanza's address in an attempt to gather information on the Truck and the reason for the Truck being left on the Property. *See id.* at 10:37. Shortly after leaving the Property, while driving on the road on which the Property was located, Deputy Johnston observed two vehicles traveling in the opposite direction, i.e., towards the Property. *See id.* at 10:38, 1:12. Deputy Johnston radioed Deputy Kilhefner to notify him that two vehicles were headed towards the Property. *See id.* at 10:38, 1:12–13. When approaching the Property, one of the vehicles slowed, before continuing down the road, away from the Property. *See id.* at 10:38–39. The driver of the other vehicle, a Mazda sedan (the "Sedan" and together with the Truck, the "Vehicles"), pulled into the driveway of the Property, parked, and exited the Sedan. *See id.* at 10:39. At the Hearing, Deputy Kilhefner identified Defendant as the driver of the Sedan. *See id.* Upon exiting the Sedan, Defendant informed Deputy Kilhefner that he had come to the Property to arrange for the Truck to be towed. *See id.* at 10:41–42. Deputy Kilhefner believed that Defendant, a male, was not Ms. Esparza. *See id.* at 10:41. Upon observing

4

in his mirror that the Sedan had turned into the Property's driveway, Deputy Johnston made a U-turn and returned to the Property. *See id.* at 1:13.

Deputy Kilhefner and Defendant had the following interaction shortly after Defendant arrived at the Property:

> Deputy Kilhefner: Who has the keys to [the Truck]?
>
> Defendant: My grandmother has them, should I go get them?
>
> Deputy Kilhefner: No. So you are just showing up here. In other words, you were driving last night, did you hit a sign or something?
>
> Defendant: I think I hit uh, I think I hit my mother's mailbox.

*Id.* at 10:48.[2] Defendant identified that his mother's house was located on Pecan Court in McKinney. *See id.* Deputy Kilhefner asked Defendant for his identification, but Defendant indicated that he did not have it with him. *See id.* Deputy Kilhefner then said to Defendant, "You wrecked the Truck, you got an open Modelo in the car, you got Swisher packages on the side, you were drunk last night, and you hit something"; Defendant did not respond. *Id.* at 10:48–49. Deputy Kilhefner again asked Defendant whether he had the keys to the Truck with him, and Defendant responded that he did not. *See id.* at 10:49–50. Deputy Kilhefner asked Defendant who had given him permission to park the Truck on the Property; Defendant responded that nobody gave him permission. *Id.* at 10:50. Deputy Kilhefner asked Defendant if he had slept in the Truck the previous night; Defendant responded that he had. *See id.* Deputy Kilhefner told Defendant, "We could wait here for two hours with everyone, 'cause you're not free to leave, right." *Id.* at 10:54; Dkt. 36-5 at 5:15. Deputy Kilhefner again asked Defendant whether the damage to the Truck was caused by Defendant hitting his mother's mailbox, and Defendant responded that it could have

---

[2] Deputy Kilhefner's body microphone captured the interactions between Deputy Kilhefner and Defendant. Deputy Kilhefner testified that at the time of the relevant events, the Collin County Sheriff's Office had issued body microphones (but not body cameras) to its officers. The recording from Deputy Kilhefner's body microphone was offered and admitted as Government's Exhibit 4.

been something else. *See id.* at 10:55. Deputy Kilhefner testified that given Defendant's responses to his questions, there was reason to believe that Defendant had either left the scene of an accident and failed to report it or damaged property and failed to report it, and that further investigation was needed to determine whether such crimes had been committed. *See id.* at 10:55–56.

Thereafter, Deputy Kilhefner mapped a probable route from the Property to Pecan Court and departed the Property to drive that route. *See id.* at 10:58. Deputy Kilhefner drove at a slow rate of speed so that he could look for any sign of damage caused by the Truck. *See id.* at 10:59. Along the route, Deputy Kilhefner observed a damaged mailbox; he then contacted the homeowner, who told him that the mailbox had been damaged for over a year. *See id.* at 10:58–59. Upon reaching Defendant's mother's house, Deputy Kilhefner investigated the mailbox and property and observed no damage. *See id.* at 10:59.

Deputy Johnston remained with Defendant at the Property during this time. *See id.* at 10:59. While Deputy Kilhefner was driving, Deputy Kilhefner and Deputy Johnston discussed the situation by phone:[3]

> Deputy Johnston: Yeah. I could slightly see in that passenger side tint window. Like cans in the console.
>
> Deputy Kilhefner: Yeah, there's a f***ing Modelo, open Modelo right there and a f***ing Swisher Sweet package or whatever right f***ing there.

*Id.* at 11:10; Dkt. 36-4 at 9. Later in the conversation, Deputy Kilhefner referred to having seen "an open Modelo can and some marijuana s**t" in the Truck. H'rg at 1:25; Dkt. 36-3 at 22:10. Deputy Johnston testified that prior to Deputy Kilhefner leaving the Property to begin his

---

[3] This conversation was recorded on Deputy Johnston's body microphone; the recording was offered and admitted as the Government's Exhibit 2, and a partial transcript of the recording was offered and admitted as the Government's Exhibit 3. *See* Dkt. 36-3; Dkt. 36-4.

investigation, "Deputy Kilhefner had mentioned something to me about [marijuana]." H'rg 1:25–26.

During Deputy Kilhefner's investigation, Defendant asked Deputy Johnston if Deputy Johnston could request a tow truck for the Truck. *See* H'rg at 11:13, 1:14. Deputy Johnston responded that he would do so and proceeded to call a tow truck driver. *See id.* at 1:14. While Defendant and Deputy Johnston conversed, Defendant told Deputy Johnston that he did not have the keys to the Truck with him. *See id.* at 1:15, 1:17. Initially, during Defendant and Deputy Johnston's conversation, both were standing near the Truck, and Defendant was not in handcuffs. *See id.* at 1:14–15. Deputy Johnston testified that it was cold outside and that he was not sure when Deputy Kilhefner would return to the Property or when the tow truck driver would arrive. *See id.* at 1:18. Deputy Johnston asked Defendant, "You ain't got no weapons in [the Sedan], right? You can sit in it while we're waiting. Just let me check real quick before you sit down in it." *Id.* at 1:16, 1:20; Dkt. 36-3 at 19:40. Deputy Johnston testified that before he permitted Defendant to wait in the Sedan, he did "an individual check to make sure there were not firearms or anything that could hurt [Deputy Johnston]," H'rg at 1:19; the footage shows Deputy Johnston opening the driver's-side door and doing a quick search of the front seat area and then looking through a rear window. Dkt. 36-3 at 19:40. Deputy Johnston testified that when he opened the driver's side door, he smelled the odor of marijuana and observed a small baggy and some marijuana "shake" on the floorboard. *See* H'rg at 1:19; Dkt. 36-1 at 24–25. Deputy Johnston asked Defendant, "How much weed you been smoking, sir?" and Defendant responded, "There ain't no telling"; Officer Johnston then said, "I don't care if it smells like marijuana, I'm asking you a general question," to which Defendant responded, "Yeah I smoked a little." *Id.* at 1:20–21; Dkt. 36-3 at 20:00. Defendant then

7

returned to sit in the Sedan, while Deputy Johnston continued his phone conversation with Deputy Kilhefner. *See* Dkt. 36-3 at 20:00.

After the tow truck driver arrived, at which point Deputy Kilhefner had returned to the Property, Defendant handed the keys to the Truck to the tow truck driver. *See* H'rg at 11:26–27. After the Truck began beeping, the Officers realized that Defendant had given a set of keys to the tow truck driver, despite Defendant's multiple statements that he did not have the keys to the Truck; Deputy Kilhefner seized the keys, opened the Truck, and began searching the Truck. *See id.* at 11:21, 1:27–29. Defendant then said to the Officers that they could not prove he was the one who parked the Truck at the Property. *See id.* at 1:29.

Deputy Kilhefner and Deputy Johnston each testified that besides the alleged trespass, there had been no incident reported to which the Officers could connect Defendant. *See id.* at 11:15, 1:32. Deputy Kilhefner further testified that approximately forty minutes elapsed between the time he told Defendant that Defendant was "not free to leave" and the time Defendant was arrested. *See id.* at 11:24.

During the search of the Truck, Deputy Kilhefner found 16.69 grams of methamphetamine, 100.42 grams of heroin, marijuana residue, digital scales with narcotic residue, empty Modelo cans throughout the Truck, and Swisher Sweets packages. *See* Dkt. 29 at 6; Dkt. 36-2 at 18. During the search of the Sedan, Deputy Kilhefner found 2.76 grams of marijuana and a digital scale with narcotic residue. *See* Dkt. 29 at 6.

## II.   LEGAL STANDARD

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

>particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Thus, under the Fourth Amendment: (1) all searches and seizures must be "reasonable"; and (2) a warrant may not be issued unless probable cause is properly established, and the scope of the authorized search is set forth with particularity. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citing *Payton v. New York*, 445 U.S. 573, 584 (1980)). Generally, a warrant must be obtained prior to conducting a search and seizing evidence; warrantless searches and seizures are presumptively unreasonable. *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). However, because the "ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . the warrant requirement is subject to certain reasonable exceptions." *Id.* (internal citations omitted).

Evidence obtained through an unreasonable search may be suppressed under the exclusionary rule. *See Herring v. United States*, 555 U.S. 135, 139 (2009) ("Nonetheless, our decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."). However, "suppression is not an automatic consequence of a Fourth Amendment violation." *Id.* at 137. "Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* The "exclusionary rule is not an individual right" and only applies where it "results in appreciable deterrence." *Id.* at 141 (citations omitted).

To suppress evidence on Fourth Amendment grounds, "[t]he party seeking suppression 'has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'" *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992) (internal citation omitted)). Thus, because "[w]arrantless searches are per se unreasonable," if the movant makes a preliminary showing that a search or seizure occurred without a warrant, the burden shifts

9

to the prosecution to show "that [the] warrantless search or seizure fits within one of the [recognized] exceptions" to the warrant requirement. *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (citation omitted); *see also United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (per curiam) ("The government bears the burden of showing the reasonableness of a warrantless search or seizure." (citing *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995))).

### III.   ANALYSIS

Defendant moves to suppress evidence seized from the Vehicles. *See* Dkt. 21 at 12. The Vehicles at issue were searched without a warrant and Defendant asserts that the searches did not take place under any exception to the warrant requirement. *See* Dkt. 30 at 9. The Government asserts that the Officers had probable cause to believe that the Vehicles contained evidence of Defendant's criminal activity, justifying a warrantless search of the Vehicles. *See* Dkt. 29 at 11.

The Court finds there was probable cause to search both the Truck and the Sedan under the automobile exception.

#### A. The Truck

The Government argues that the "automobile exception" to the warrant requirement applies to the search of the Truck. *See* Dkt. 29 at 8. The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity. *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson* 527 U.S. 465, 467 (1999)). The automobile exception is founded upon (1) "the automobile's ready mobility, an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear" and (2) "the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (citing *California v. Carney*, 471 U.S. 386, 390–92 (1985)). The Court applies a totality of the

circumstance test for probable cause determinations. *United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997) (citing *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)).

The Court finds there was probable cause to believe that the Truck contained contraband at the time of the search. The Officers responded to a call that the Truck was parked on private property, and the owner of the Property did not know to whom the Truck belonged. *See* Dkt. 21 at 2. Upon arriving at the Property, the Officers observed that the Truck was parked behind the Property. *See* H'rg at 10:25. The Officers further observed that the Truck sustained damage to the front-end, side, and back-end, as well as to the front wheel, likely rendering the Truck undrivable. *See id.* 10:25–26. When inspecting the Truck further, Deputy Kilhefner observed that the front window was fogged from the interior, that there were open Modelo beer cans on the floorboard, Swisher Sweets cigar packets, and a "green leafy substance" in plain view. *See id.* at 10:26, 10:35–36. Deputy Kilhefner testified that he believed the "green leafy substance" was marijuana. *Id.* at 10:36. When Defendant arrived at the Property, Defendant repeatedly told the Officers that he did not have the keys to the Truck with him and asked if he could call his grandmother to ask her to bring the keys. *See id.* at 10:48. Defendant also admitted that he had not received permission to park the Truck at the Property and confirmed that he had slept in the Truck the previous night. *See id.* at 10:50. When asked how the Truck was damaged, Defendant stated that he hit the Truck on his mother's mailbox. *See id.* at 10:48–50. Later, Deputy Kilhefner told Defendant that he was going to drive to Pecan Court to look for the damaged mailbox; Defendant responded that the mailbox he hit may not have been his mother's but someone else's. *See* Dkt. 36-6 at 5:25. Prior to conducting the search, Deputy Kilhefner drove the route from the Property to Pecan Court (the purported location of Defendant's mother's property) and found no damage along the route or to Defendant's mother's mailbox. *See id.* at 10:58. When Deputy Kilhefner returned, the tow truck

had arrived and it was only at this point that the Officers learned that Defendant did in fact have the keys to the Truck on his person, despite Defendant's multiple statements to the contrary. *See* H'rg at 11:26–27. Only at this point did the Officers obtain the keys and search the Truck. *See id.* at 11:21, 1:27–29. The events prior to the search, taken together, amount to probable cause.

Defendant argues that he was not operating the Truck at the time of the investigation and that there was no stop of Defendant in the Truck; as such, the automobile exception should not be applied. *See* Dkt. 30 at 6. Although there was no stop and the Truck was likely undrivable, this does not render the automobile exception inapplicable. "Even where an automobile is not immediately mobile at the time of the search, 'the lesser expectation of privacy resulting from *its use as a readily mobile vehicle* justifie[s] application of the vehicular exception.'" *Fields*, 456 F.3d at 524 (quoting *Carney*, 471 U.S. at 392). Defendant's expectation of privacy in his vehicle is arguably even less where, as is the case here, the vehicle has been left on someone else's private property. *Cf. United States v. Gomez*, 276 F.3d 694, 698 (5th Cir. 2001) (holding Defendant had a reasonable expectation of privacy in a vehicle left on *his* real property). The Officers believed, based on Defendant's own admission, that Defendant had driven the Truck the previous evening and observed that the Truck had been involved in a collision of some sort. *See* H'rg at 10:27–28, 10:48–50. Further, Defendant admitted to hitting a mailbox or something else while driving the Truck. *See id.* at 10:48. The Truck's immobility was due to Defendant's disregard of driving regulations and, as such, does not entitle Defendant to a heightened privacy interest. *See id.*

Defendant places great emphasis on the fact that the Truck was not on a public roadway at the time of the search and was instead located behind a private residence. The automobile exception "has been applied to warrantless searches of vehicles parked in driveways or lots other than those used by the defendant for residential purposes." *Beene*, 818 F.3d at 164 (collecting

cases). It is undisputed that the Property was not Defendant's residence, and Defendant did not have permission to leave the Truck on the Property. *See* Dkt. 21 at 2; Hr'g at 10:50. Defendant does not argue that he otherwise had a reasonable expectation of privacy at the Property. Accordingly, the automobile exception applies. *See Rountree v. Lopinto*, 976 F.3d 606, 609 (5th Cir. 2020).

Because the Officers had probable cause to believe that the Truck contained evidence of criminal activity, the Officers' search of the Truck was justified under the automobile exception to the warrant requirement.

**B.  The Sedan**

The Government similarly argues that there was probable cause to search the Sedan under the automobile exception.[4] Defendant arrived at the Property in the Sedan on the morning of January 10, 2022, after the Officers had begun their initial investigation of the Truck, determined that the registered owner was Ms. Esparanza, and peered inside the Truck observing the open Modelo beer cans, Swisher Sweets cigar packages, and "green leafy substance" in plain view. *See* Hr'g at 10:21–22, 10:33–34, 10:39. It was immediately apparent to Deputy Kilhefner that Defendant was not Ms. Esparanza, the registered owner. *See id.* at 10:42. Defendant told Deputy

---

[4] Defendant asserts that he was unlawfully detained and therefore, the search of the Sedan is fruit of the poisonous tree and should not be considered by the Court. However, the Court need not consider whether Defendant was unlawfully detained because there is sufficient probable cause prior to any potential detainment of Defendant to support the search under the automobile exception. *See Brendlin v. California*, 551 U.S. 249, 255 (2007) ("[A] seizure occurs if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave . . . . [B]ut . . . when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests to otherwise terminate the encounter[.]" (cleaned up)). Defendant's statements that he did not have the keys to the Truck with him (*See* H'rg 10:49–50; Dkt. 36-5 at 1:14), that he had not received permission to park the Truck on the property (*See* H'rg 10:50; Dkt. 36-5 at 2:40), that he had slept in the Truck the previous night (*See* H'rg 10:50; Dkt. 36-5 at 3:40) and that the damage to the truck resulted from Defendant hitting the Truck on his mother's mailbox (*See* H'rg 10:48; Dkt. 36-5 at 1:25) were all made prior to Deputy Kilhefner telling Defendant that Defendant was not free to leave (*See* H'rg 10:54; Dkt. 36-5 at 5:15). Further, Deputy Kilhefner saw the open Modelo beer cans, Swisher Sweets packages, and "green leafy substance" in plain view when he looked through the window of the Truck. *See* H'rg 10:26, 10:35–36. The Court does not consider any of the investigatory evidence obtained after the statement from Deputy Kilhefner that Defendant was not free to leave in making its probable cause determination.

Kilhefner that he was there to get the Truck towed but then claimed to not have the keys to the Truck. *See id.* at 10:41, 10:48. When asked for identification, Defendant told the Officers that he did not have his identification with him but provided his driver's license number. *See id.* 10:48; *see also United States v. Cavitt*, 550 F.3d 430, 437 (5th Cir. 2008) (holding that reasonable suspicion may arise when nervousness, giving evasive answers, and inconsistent statements are coupled with more concrete evidence that suggests the commission of an offense). Furthermore, the search of the Sedan took place after the search of the Truck, during which the Officers discovered methamphetamine, heroin, marijuana residue, digital scales with narcotic residue, and empty Modelo containers in the Truck. *See* Dkt. 36–6; Dkt. 29 at 6. These circumstances, including the circumstances that led to the search of the Truck, amount to probable cause that similar contraband would be present in the Sedan. *Cf. United States v. Salemi-Nicoloso*, 353 F. Supp. 3d 527, 540 (N.D. Miss. 2018) (finding that after searching one vehicle and finding contraband, officers had probable cause to search a second vehicle when there was a causal link between the two vehicles).

## IV.  RECOMMENDATION

For the foregoing reasons, the Court recommends the Motion (Dkt. 21) be **DENIED.**

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party filing objections is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal

conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *see also Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 16th day of October, 2023.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE